* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence, affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are properly before the Industrial Commission and are subject to governance by the North Carolina Workers' Compensation Act.
2. An Employee-Employer relationship existed at all relevant times between Plaintiff-Employee Kevin Wayne Taylor and Defendant-Employer Greensboro Tire and Auto.
3. Defendant-Employer was insured by Universal Underwriters Group at all relevant times.
4. Plaintiff's average weekly wage is to be determined by a Form 22 Wage Chart, which was included with Stipulated Exhibit No. 1.
5. The parties stipulate to the following documents as admissible evidence: Industrial Commission Forms 18, 19, 22, 61, 33, and 33R.
6. The issues to be determined are: (1) whether the Plaintiff suffered a compensable injury, as defined by the North Carolina Workers' Compensation Act; and (2) what benefits, if any, is Plaintiff entitled to under the Workers' Compensation Act?
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. The issues on appeal are: (a) whether Plaintiff was disabled as a result of his workplace injury on July 1, 2002, and (b) whether Plaintiff's intoxication on July 1, 2002, was the proximate cause of his workplace injury.
2. At the time of the hearing before the Deputy Commissioner, Plaintiff was thirty-seven years of age with a date of birth of April 10, 1968. Plaintiff is married with three children, having completed the tenth grade. At the age of seventeen, Plaintiff first worked for Defendant-Employer and received on-the-job training. Plaintiff subsequently completed some carpentry classes and acquired an air conditioning license and a mechanic's license from Guilford Technical Community College. Plaintiff began working for Defendant-Employer a second time in November 2001, as a first-shift mechanic doing tune-ups, brake jobs, transmission work and front-end alignments.
3. On July 1, 2002, Plaintiff's wife drove him to work around eight o'clock in the morning. Plaintiff changed into his work clothes, chatted with some fellow employees, checked to see what services needed to be performed and began replacing the engine in a car. Plaintiff testified that an assistant who was working in the area unwrapped a new tool cart and discarded the paper wrapping onto the floor. Plaintiff testified that he slipped on the discarded paper causing him to twist his right knee and fall to the floor. The twist and fall incident occurred around one or two o'clock in the afternoon. Defendants do not dispute that Plaintiff twisted his knee and fell, but they do dispute that he slipped on a piece of paper.
4. An independent insurance agent, Jerry Shaw, was present at Defendant-Employer's on July 1, 2002, and saw Plaintiff twist and fall. Mr. Shaw assisted Plaintiff into a chair and later drove him to seek medical treatment.
5. At Urgent Medical Family Care, Plaintiff reported to Dr. Dominic McKinley that he slipped on a wet spot at work, twisted his knee and fell. Dr. McKinley is board certified in family medicine and has a certificate of added qualifications in sports medicine. The parties tendered Dr. McKinley as an expert in the field of family and sports medicine. When Plaintiff presented to Dr. McKinley, he had a minimal amount of swelling, some tenderness and difficulty moving his knee, but his x-rays were normal as were his nerve and vascular function. Plaintiff was treated with a knee immobilizer, told to rest and ice his knee, taken out of work for two days and given Vicodin for pain.
6. On that same day, Dr. McKinley's office administered a drug screening to Plaintiff, which later revealed a positive cocaine result. Dr. McKinley testified that the pain medications previously given to Plaintiff would not cause a false positive result on the drug screening. He testified that mixing pain medications and cocaine, however, could cause sedation, drowsiness and loss of motor skills.
7. Plaintiff admitted to drinking alcohol and using cocaine on the evening of June 29, 2002, to the point that he blacked out and could not remember any details from that night. He testified that he went home, passed out on the couch, and did not get up until nine thirty on Sunday night, when he ate something. Plaintiff testified that he was not impaired when he went to work on the morning of Monday, July 1, 2002, because he could "walk straight."
8. Dr. Arthur Davis, Jr., an expert in the field of pathology and toxicology, testified that cocaine affects normal body functions such as body movements, balance, coordination, perception, awareness and can even cause depression and a schizophrenic-like syndrome. Dr. Davis testified that the threshold level for intoxication from cocaine is 300 nanograms per milligram and Plaintiff tested with a level of 379 nanograms per milligram. Dr. Davis concluded that Plaintiff was definitely intoxicated on July 1, 2002. Moreover, the drug screening, as interpreted by Dr. Davis, indicated that Plaintiff had consumed cocaine shortly before his accident, based upon the concentration in Plaintiff's body. Dr. Davis, however, did not testify that Plaintiff's intoxication was the proximate cause of his twist and fall injury.
9. Although the drug screening, as interpreted by Dr. Davis, sufficiently establishes that Plaintiff had consumed cocaine shortly before his accident, there was no testimony from anyone who saw Plaintiff at work on July 1, 2002, which would establish that he was acting as if he was intoxicated or his physical and mental facilities were appreciably impaired. The evidence fails to establish that Plaintiff's twist and fall at work was proximately caused by intoxication or being under the influence of cocaine.
10. When next seen by Dr. McKinley on July 3, 2002, Plaintiff still had complaints of knee pain and limited range of motion. Dr. McKinley found it significant that Plaintiff was experiencing tenderness between his kneecaps and the medial joint line, possibly indicating a meniscus injury. Plaintiff was advised to continue with the knee immobilizer and begin range of motion exercises. His pain medication was changed to Ultracet. Dr. McKinley wrote Plaintiff out of work due to his knee sprain for five days.
11. Plaintiff returned to Dr. McKinley on July 8, 2002, at which time Dr. McKinley found no objective evidence of cartilage tear, but recommended an MRI due to the prolonged discomfort Plaintiff was experiencing and the type of injury he suffered. The last date Dr. McKinley saw Plaintiff was on July 8, 2002, and he did not know whether an MRI was performed. Dr. McKinley wrote Plaintiff out of work due to his knee sprain for seven days.
12. Plaintiff's family physician, Dr. Tammy Spear of Family Practice of Summerfield, is board certified in family medicine. The parties tendered her as an expert in the field of family medicine. Dr. Spear saw Plaintiff for his knee problems on July 17, 2002, at which time he presented with complaints of knee pain and reported that he had twisted his knee and fallen to the ground three weeks earlier. He also reported having had three previous surgeries on the right knee. Dr. Spear noted that the x-rays from Urgent Medical Family Care were negative for bone fractures. She felt Plaintiff may have some cartilage damage and referred him for an orthopaedic evaluation with Dr. Vincent Paul.
13. While employed with another employer, Freeman Sets and Services, in June 2000, Plaintiff fell six to eight feet from a cherry picker while setting up a window display for Lowe's or Home Depot. Plaintiff came under the care of Dr. Andrew Collins at Greensboro Orthopaedic Center. Dr. Collins recommended that Plaintiff return to modified or light-duty work. As of August 17, 2000, Dr. Collins noted, "this patient may lack some motivation as far as returning to work. I do not think he has an operative knee by any means."
14. In late 2000, Dr. Collins sent Plaintiff for a functional capacity evaluation (FCE), which indicated that Plaintiff could perform medium-duty work. As of January 3, 2001, after Plaintiff had been out of work for eight months, Dr. Collins reviewed the FCE results with Plaintiff. At that time, Dr. Collins assessed a "symptomatic plica" and recommended right knee arthroscopy. This was Plaintiff's last follow-up visit with Dr. Collins, after which Plaintiff began treatment with Dr. J. Wayne Keeling of Reidsville.
15. In early 2001, Dr. Keeling performed arthroscopic surgery on Plaintiff to remove plica from the right knee. Plaintiff was released with a ten percent (10%) permanent impairment rating to his right knee.
16. Dr. Paul is a general orthopaedic surgeon with Guilford Orthopaedics and Sports Medicine Center. The parties tendered him as an expert in orthopaedic surgery. Dr. Paul first treated Plaintiff on August 8, 2001, for a second opinion evaluation regarding an injury Plaintiff sustained to his right knee on June 10, 2000. At that time, Plaintiff was walking with a limp, and wearing a brace on his knee. Upon examination, Dr. Paul found that Plaintiff's kneecap was sliding to the outside. Dr. Paul believed that Plaintiff would benefit from scoping the knee again and, depending on the findings, he would consider liquid collagen injections or a Fulkerson slide procedure, which is a realignment procedure that decreases the pressure on the back of the kneecap. Plaintiff did not treat with Dr. Paul again until July 24, 2002, after his second knee injury. At the July 24, 2002 visit, Plaintiff or his wife reported that he missed a step at home, twisted his knee and fell.
17. At the July 24, 2002 visit, Dr. Paul diagnosed Plaintiff with a knee sprain and chondromalacia, which is the softening of the cartilage. Plaintiff was placed in a knee immobilizer and taken out of work until he could undergo arthroscopic surgery to assess the posterior patella and shave it if necessary. Plaintiff did not return to Dr. Paul until December 13, 2002, at which time he informed Dr. Paul that his knee injury occurred at work and not at home. Plaintiff was given a cortisone injection at this visit.
18. Plaintiff underwent surgery as recommended by Dr. Paul on January 28, 2003. Large plicas were removed during the surgery and Dr. Paul performed a release of a lateral retinaculum and shaved a meniscus tear. Because the procedure did not relieve Plaintiff's pain, liquid cartilage was injected into his knee on May 30, 2003. Plaintiff received no relief from the injections and on July 29, 2003, a Fulkerson slide was performed, where a cut of bone is taken from the place where the tendon attaches to the bone from the patella and slid over, causing the kneecap to settle into the groove better, decreasing the level of pain. Dr. Paul testified that although Plaintiff initially did well following the Fulkerson slide, his right knee became symptomatic again and a partial knee replacement was performed on December 4, 2003. The screws from the Fulkerson slide were removed on April 13, 2004. Dr. Paul testified that Plaintiff has been doing great since the partial knee replacement, he is no longer on narcotic medicine for pain, and he has not been back for treatment since April 2004.
19. Dr. Paul opined that based on the removal of hardware from Plaintiff's knee in April 2004, he would not have been able to return to work until the first of May 2004. Plaintiff has not returned to Dr. Paul in order to have a permanency rating assigned, but Dr. Paul testified that based on the partial knee replacement, he would anticipate a twenty-five percent (25%) rating to the right knee, which includes atrophy to the quadriceps. Dr. Paul further testified that there was a forty percent (40%) chance that Plaintiff would need another knee replacement in the future, as there is a twenty-five (25) year lifespan on knee prosthesis.
20. When asked to render an opinion on whether the procedures he performed were the result of the first cherry picker incident or necessitated by an exacerbation caused by the twist and fall injury at work, Dr. Paul testified that the problems caused by Plaintiff's first injury in 2000, had flared up from time to time and was at a point of giving him miserable pain. Dr. Paul testified that he was trying to solve this problem when Plaintiff presented with a second injury in July 2002. Dr. Paul testified that he could see how a twist and fall injury might have aggravated the plicas in Plaintiff's right knee causing inflammation and pain, but removal of the plicas did not relieve Plaintiff's pain. Therefore, Dr. Paul could not make a direct connection between the twist and fall incident and Plaintiff's partial knee replacement.
21. Dr. Paul further testified that prior to Plaintiff's twist and fall incident, he had a pre-existing condition that would have taken his treatment through the Fulkerson slide and probably to knee replacement. He opined that the treatment Plaintiff received from July 24, 2002, and thereafter, was the same treatment plan he would have used from the first time he treated Plaintiff in August 2001. Dr. Paul opined that his treatments were related to the first injury and not the twist and fall workplace injury.
22. In response to Plaintiff's hypothetical question asking Dr. McKinley to assume that Plaintiff was injured from a twist and fall injury at work, Dr. McKinley opined that such an injury could cause the pain and discomfort Plaintiff reported as well as aggravate a pre-existing knee condition. Dr. McKinley was unaware that Plaintiff had treated with Dr. Paul in 2001, for a previous injury to the same knee and did not have an opportunity to review any records regarding the previous injury. Dr. McKinley testified that he would defer to Dr. Paul's opinion on Plaintiff's pre-existing knee condition as well as causation regarding his current condition and its relationship to his twist and fall at work.
23. Dr. Spear testified concerning a medical note dated January 30, 2004, in which Plaintiff presented with situational anxiety and depression as a result of his knee replacement and being out of work for two years. She opined that such depression over an injury's effect on a person's ability to work was not uncommon. She testified that Plaintiff had presented to her practice with chronic anxiety as early as November 14, 2000, and had been on mood disorder medication in the past.
24. Dr. Spear deferred to Dr. Paul's opinion on the issue of Plaintiff's pre-existing condition as well as causation regarding his current medical condition.
25. The Full Commission gives great weight to the opinion testimony of Dr. Paul that Plaintiff's treatment and subsequent surgeries were necessitated by his first injury and not the twist and fall workplace injury.
26. Plaintiff has failed to prove that he was unable to return to work in his pre-injury job or any other employment beyond the fifteen days he was written out of work due to his twist and fall injury by accident. Plaintiff's ongoing right knee problems after July 17, 2002, were not caused by the accident at work.
27. Plaintiff's average weekly wage was $760.36, yielding a compensation rate of $506.91.
28. Defendants are responsible only for payment for the initial emergency treatment and follow-up treatment rendered to Plaintiff through Urgent Family and Medical Care during July 2002, and the initial visit of July 17, 2002 to Dr. Tammy Spear, to assess his knee.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. On July 1, 2002, Plaintiff suffered an injury by accident arising out of and in the course of his employment with Defendant-Employer when he fell at work. N.C. Gen. Stat. §97-2(6).
2. The evidence sufficiently establishes that Plaintiff had used a controlled substance, cocaine, shortly before his accident of July 1, 2002, and that the level of cocaine in his body at the time of the accident exceeded the threshold level for intoxication or appreciable impairment. However, the greater weight of the evidence fails to establish that being under the influence of cocaine, was the proximate cause of Plaintiff's injury by accident, so as to bar recovery of benefits. N.C. Gen. Stat. § 97-12.
3. Although Plaintiff sustained an injury by accident at work, the greater weight of the evidence shows that the accident caused only a temporary sprain to his right knee, and did not cause the problems for which he subsequently had surgery. Defendants are responsible only for payment for the initial emergency treatment and follow-up treatment rendered to Plaintiff through Urgent Family and Medical Care during July 2002, and the initial visit of July 17, 2002 to Dr. Tammy Spear, to assess his knee condition. N.C. Gen. Stat. §§ 97-2(19), 97-25.
4. The greater weight of the evidence establishes that the subsequent treatment and the multiple surgeries to Plaintiff's right knee performed by Dr. Vincent Paul were not necessitated by the twist and fall of July 1, 2002, but were necessitated by Plaintiff's pre-existing right knee condition. The evidence fails to establish that the accident of July 1, 2002, materially aggravated Plaintiff's pre-existing right knee condition. Therefore, Defendants are not responsible for the extensive follow-up medical treatment of Plaintiff's right knee, including the treatment and surgeries by Dr. Paul. N.C. Gen. Stat. §§97-2(19), 97-25, Holley v. ACTS, Inc., 357 N.C. 228 (2003).
5. As a result of his injury by accident of July 1, 2002, Plaintiff was removed from work by competent medical authority and was unable to earn wages in his employment and was temporarily totally disabled for a period of fifteen days, for which he would be entitled to compensation pursuant to N.C. Gen. Stat. § 97-29. Considering the seven-day waiting period, Plaintiff is only entitled to receive compensation for eight days. N.C. Gen. Stat. § 97-28.
6. Plaintiff's average weekly wage was $760.36, yielding a compensation rate of $506.91. N.C. Gen. Stat. § 97-2(5).
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to Plaintiff temporary total compensation at the rate of $506.91 per week for a total of eight days. This amount has accrued and shall be paid in a lump sum.
2. Defendants shall pay the costs of Plaintiff's visits to Urgent Medical and Family Care of July 2002, and his visit to Dr. Tammy Spear on July 17, 2002. Defendants are not responsible for any further medical visits to Dr. Spear or Dr. Paul thereafter.
3. Twenty-five percent of the compensation awarded Plaintiff under Paragraph 1 of this Award is hereby approved as attorney's fees. This amount shall be deducted from the amount awarded to Plaintiff in Paragraph 1 of this Award and shall be paid directly to Plaintiff's counsel in a lump sum.
4. Defendants shall pay the costs.
This the __ day of June 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER